IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELISABETH HELLER,[1] §<br>   Plaintiff, §<br>§<br>v. §<br>§<br>GINA McCARTHY, Administrator, U.S. §<br>ENVIRONMENTAL PROTECTION AGENCY, §<br>   Defendant. § | Civil Action No. 1:16-cv-2302 |

# PLAINTIFF'S ORIGINAL COMPLAINT UNDER TITLE VII

## I. SUMMARY

*Former EPA Office of Inspector General (OIG) Special Agent Elisabeth Heller filed a Title VII complaint over what she asserted was inappropriate conduct based on her gender by EPA Office of Homeland Security (OHS) official Steven Williams in October 2013. In April 2015, she and the agency resolved the complaint. But then, more than 650 days after the original incident, the Department of Defense (DoD) OIG generated a related Report of Investigation (ROI) on behalf of EPA. Surprisingly, the ROI made multiple references to her EEO activity and included related documentation. It went on to assert she engaged in wrongdoing, though she had been identified as a witness rather than subject of the inquiry. The ROI cleared Williams, disregarding contemporaneous testimony from his subordinate and complaints from other females.*

*EPA OIG management widely criticized the DoD ROI, yet a senior manager used it to formally counsel Agent Heller and create a negative record in her file that can harm her ability to testify in court. This manager disavowed knowledge of her EEO activity, though it was referenced in the very report he relied on for taking action against her.*

---

[1] A federal law enforcement officer, Plaintiff requests waiver of the requirement to identify her home address here. That address will be provided directly to Defendant's counsel.

## II. JURISDICTION AND ADMINISTRATIVE EXHAUSTION[2]

1. This Court has jurisdiction because the Defendant is a federal official being sued in her official capacity and the suit raises federal questions (e.g., claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16).

2. Prior to this suit, Plaintiff exhausted her administrative remedies as follows:

    2.1. Plaintiff requested EEO Counseling on November 16, 2015, which was within 45 days of the October 26 and November 10, 2015 actions of which she complained.

    2.2. The Notice of Right to File (NRTF) a formal complaint was emailed to her attorney on December 15, 2015.

    2.3. A formal EEO complaint was filed on December 18, 2015, which was within 15 days of receipt of the NRTF.

    2.4. Plaintiff Heller then cooperated in the EPA's preparation of an EEO investigative report (cited below as "EEO ROI," as contrasted with the "DoD ROI" identified earlier).

    2.5. Suit was filed more than 180 days after the filing of the formal EEO complaint, but prior to issuance of any final agency action (such as a Final Agency Decision) as to the complaint.

    2.6. 29 CFR § 1614.407(b) permits the filing of a civil suit in a federal employee Title VII action after 180 days from the date of the filing of a complaint "if an appeal has not been filed and final action has not been taken."

---

[2] Assertions in this pleading are made in addition and in the alternative to each other. They are based on the limited amount of information available pre-discovery and so subject to correction and clarification as the case develops.

## III. PARTIES AND SERVICE

3. Defendant GINA McCARTHY is sued in her official capacity as the Administrator, U.S. Environmental Protection Agency, and is being served at EPA. (Because this is an official capacity suit, Defendant alternatively is referred to in this suit as the Administrator, "the agency," or "EPA.")

4. The United States Attorney General and the Civil Process Clerk for the United States Attorney for the District of Columbia also are being served.

5. Plaintiff Elisabeth Heller is a resident of the Commonwealth of Virginia.

6. She is referred to below such as with "Plaintiff" or "Special Agent Heller." She no longer works for EPA, but continues in federal law enforcement.

## IV. VENUE AND OTHER MATTERS

7. The employment practices (e.g., the counseling and direction to place a record of it in the personnel files of Plaintiff) identified as unlawful occurred in the District of Columbia.

8. Defendant has its principal office in the District of Columbia.

9. 42 U.S.C. § 2000e-5(f)(3) provides that a Title VII action may be brought in any judicial district in the state in which the unlawful employment practice is alleged to have been committed.

    9.1. It further provides that if the respondent employer is not found in any of the locations identified as possible venues under the statute, an action may be brought in the judicial district of the employer's principal office.

10. In light of paragraphs 6-9 above, venue is proper in the federal courts of the District of Columbia.

11. Plaintiff complied with all conditions precedent to bringing this action.

12. Plaintiff mitigated her damages to at least the extent required by law.

## V. EEO REPRISAL DISCRIMINATION UNDER TITLE VII

### A. Legal Context

13. 42 U.S.C. § 2000e-16(a) requires that all personnel actions affecting employees in executive agencies "shall be made free from any discrimination based on race, color, religion, sex [i.e., gender], or national origin."

    13.1. This "free from discrimination" requirement imposes a higher obligation on the federal government as an employer than is required of private employers, for whom the law prohibits taking employment actions "because of" protected characteristics like race, gender, and national origin. *Compare* 42 U.S.C. § 2000e-2(a).

14. Title VII, at 42 U.S.C. § 2000e-3 also prohibits discrimination for EEO activity, such as opposition to unlawful practices, filing a charge of discrimination, or testifying in an investigation or proceeding.

    14.1. 29 C.F.R. § 1614.101(b) in turn prohibits reprisal against federal employees for protected EEO activity such as participating "in any stage of administrative or judicial proceedings under" statutes including Title VII.

15. The U.S. Supreme Court has held that, as to private employers, reprisal is prohibited where "a reasonable employee would have found the challenged action materially adverse," meaning that "it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal citations omitted).

16. The standard is phrased "in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id.* at 69.

17. The issue of materiality of an action said to be retaliatory may properly be resolved by a jury. *Id.* at 73 (jury reasonable in concluding suspension materially adverse).

18. While some courts have held that letters of counseling are insufficient to constitute an actionable reprisal claim, these generally have been in situations such as where the reprisal claim was framed as a hostile work environment, there was no evidence of impact on position/grade/salary/promotion opportunities, the plaintiff was not a law enforcement officer (LEO), or some combination of these.

19. Courts recognize that there is "no rule that letters of reprimand are *per se* non-actionable"; instead the "case law is clear that the 'material adversity' inquiry is necessarily context-specific" and "reducible to a comprehensive set of clear rules."[3]

20. What might have been a minor blemish on the record of a civilian may be a major one for a federal law enforcement officer.[4]

21. Federal prosecutors may decline to pursue a case where the assigned agent has suggestions of dishonesty or misconduct in her background, as the underlying allegations may have to be disclosed to the defense.[5]

---

[3] *Richardson v. Petasis*, No. CV 13-00826 (RC), 2015 WL 8082244, at *33 (D.D.C. Dec. 7, 2015) (internal quotations and citations omitted). As another court explained, "counseling letters, *in most cases,* do not constitute adverse employment actions…" *Bowe-Connor v. Shinseki*, 923 F. Supp. 2d 1, 9 (D.D.C. 2013) (emphasis supplied).

[4] *See, e.g., Fogg v. Ashcroft,* 254 F.3d 103, 113 (D.C. Cir. 2001) (finding it was not unreasonable for employer to hold officer to higher standard of conduct than a civilian).

[5] *See, e.g.,* EPA Interim Guidance 2015-008 (May 22, 2015) regarding obligations of agent disclosure of potential impeachment information under *Giglio, Henthorn,* and *Brady.*

## B. Basic Claims

22. Plaintiff Heller engaged in protected EEO activity.

23. For example, she:

    23.1. initiated EEO Counseling;

    23.2. filed a formal complaint of discrimination around November 26, 2013;

    23.3. filed with the EEOC Office of Federal Operations a February 27, 2014 appeal of EPA's dismissal of her complaint;

    23.4. opposed practices she believed were unlawful under Title VII, such as by notifying EPA OIG management and other senior EPA officials like Administrator McCarthy and Deputy Chief of Staff (DCOS) John Reeder that she considered Steven Williams' conduct toward her to be unacceptable; and

    23.5. entered into an agreed resolution of her EEO complaint around April 21, 2015, for which DCOS Reeder signed as the authorizing official.

24. One or more officials responsible for taking the challenged actions were aware of Plaintiff's EEO-related activity.

    24.1. For example—in addition to the further evidence set out later below—the DoD ROI said to have been relied on by Deputy Assistant Inspector General (DAIG) Allan Williams [no relation to Steven Williams] as a basis for counseling Plaintiff and placing a record of the counseling in her record contained multiple references to Plaintiff's EEO activity (such as related testimony by DCOS John Reeder) and an exhibit providing documentation about Plaintiff's earlier EEO activity.

24.2. EPA OIG senior management, such as DAIG Williams, as well as other EPA Senior Management, were well aware that Plaintiff had filed an EEO complaint over the 2013 events and that it finally was resolved in 2015.

25. When considered from the objective perspective of a federal law enforcement agent, the counseling and related written documentation received by Plaintiff Heller was materially adverse, in that it might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

26. For example, EEO Counselor Debbie Schwartz documented DAIG Williams as telling her how he (DAIG Williams) advised Plaintiff that while Williams considered the matter to be a minor infraction, she should disclose the counseling letter to any Assistant United States Attorney she is working with. EEO ROI at 8.

27. Such issues are serious enough matters for a law enforcement officer (LEO) that some agencies, such as the Department of Homeland Security, include reference in their table of penalties to authorizing removal for an LEO on a "first offense based on *Giglio/Henthorn* considerations."

28. The U.S. Merit Systems Protection Board has upheld a demotion of an LEO based on considerations including that the officer was impaired from testifying in court because of such concerns.

29. A Special Agent working for a federal agency's Office of Inspector General typically is expected to investigate and then present to Assistant United States Attorneys for prosecution cases involving criminal wrongdoing by agency employees. It generally is an essential duty of a series 1811 employee like Agent Heller to be able to represent the employing agency well with her testimony in court.

30. Agent Heller endured substantial psychological distress and her work performance suffered from reasonably worrying that she could invest considerable time and effort into pursuit of a worthwhile case only to find out in the end that an Assistant U.S. Attorney (AUSA) would not prosecute it based on an expectation the letter of counseling would have to be disclosed and end up being used to cross-examine her.

31. As she understands it, every time she presents a case for prosecution, the particular AUSA she is interacting with will have to make his or her own determination of whether the stain on her record constitutes *Giglio/Henthorn* material that would prompt the AUSA to decline to accept the case.

32. Plaintiff requested that EPA management confirm the counseling letter does not rise to the level of *Giglio/Henthorn* material, but management has responded that it is unable to do so (and, as above, DAIG Williams told the EEO Counselor that Agent Heller should disclose the counseling letter to AUSAs).

33. Fear of taint with *Giglio/Henthorn* issues is objectively likely to discourage a reasonable federal LEO from engaging in further EEO activity. Related issues are a frequent topic of discussion in the law enforcement community.[6]

34. EPA has used *Giglio* issues as a basis for justifying termination of a law enforcement employee, given the "high standard" to which LEOs are held.[7]

---

[6] *See, e.g.,* "Are you a 'Giglio-impaired' Law Enforcement Officer" (www.wifle.org/newsletters/december2009/nov_2009_credibleofficers.pdf); "Giglio for Law Enforcement Officers & Credibility Determinations" (www.policelawblog.com/blog/2010/12/giglio-for-law-enforcement-officers-credibility-determinations.html); "Guidance for Prosecutors Regarding Criminal Discovery" (www.justice.gov/dag/ memorandum-department-prosecutors) (directing prosecutors in cases involving parallel regulatory proceedings, such as with EPA, to consider the need to make disclosures as to LEOs working with them).

[7] *See Blue v. Perciasepe*, 970 F. Supp. 2d 34, 47-48 (D.D.C. 2013)

35. DAIG Williams is reported to have said in a 2016 (after the counseling of Agent Heller) EPA OIG training session that the quickest way to end one's career is to fail to follow policy; his counseling and written documentation as to Plaintiff Heller was in part for her purported failure to follow policy.

36. There was a nexus between Plaintiff's EEO activity and the actions taken against her. For example:

    36.1. The same events over which she had filed an EEO complaint were turned around to use as a basis for taking action against her.

    36.2. The DoD investigation upon which the counseling was said to have been based made multiple references to her EEO activity.

    36.3. The DoD investigation upon which the counseling was said to have been issued was long delayed, based on events in October 2013 but not released until August 2015, as compared to Plaintiff's entering into a resolution of her EEO complaint in April 2015.

    36.4. As addressed below, there are additional reasons to conclude that the asserted justifications for counseling action were pretextual.

    36.5. As further detailed below, DAIG Williams' disavowal of knowledge of Agent Heller's prior EEO activity, while basing his actions against her on the DoD ROI that makes multiple references to that activity, suggests impropriety.

### C. Additional Background: Convincing Mosaic of Retaliatory Intent

37. EPA headquarters staff, including Deputy Chief of Staff John Reeder, have a history of disregarding complaints about mistreatment of female employees by

senior male members of management, consistent with the agency's here acting with a motive to retaliate against Plaintiff for having made such a complaint.

37.1.  The official Plaintiff originally accused of wrongdoing—Steven Williams—as of around February 24, 2014 began reporting to Peter Jutro in the EPA Office of Homeland Security, where Jutro was Acting Associate Administrator.

37.1.1.  EPA OIG eventually determined that Mr. Jutro engaged in a pattern of conduct and exchanges, including some of a sexual nature, considered to be unwelcome by sixteen female EPA employees.

37.1.2.  EPA even put this sexual predator in charge of its internship program.

37.1.3.  It took 13 reports of sexual misconduct and/or harassment by Mr. Jutro before EPA management took action in response.

37.1.4.  The EPA Administrator's office, including at least Mr. Reeder, were aware of allegations of inappropriate conduct by Mr. Jutro but nonetheless permitted Mr. Jutro to be selected to serve as Acting Administrator of the Office of Homeland Security.[8]

38.  Similarly, when Steven Williams, who reported to Mr. Jutro and was the person Plaintiff complained of in her earlier EEO filing, separately was the subject of concerns by other females, top agency management responded by doing things like seeking to persuade the complaining female that she was the problem, that she

---

[8] *See* "EPA Mismanagement – Hearing Before the Committee on Oversight and Government Reform – House of Representatives" (April 30, 2015) (oversight.house.gov/wp-content/uploads/2016/04/4-30-15-EPA-Mismanagement.pdf).

should not have felt it necessary to make a report, and that no pattern of victimization existed. In at least one instance, management responded to a complaint by a female employee about Mr. Williams by attempting to get her to sign an inaccurate account of her assertions that would in essence recant them.

39. EPA even treated as insignificant Mr. Williams' comment in a December 2013 staff meeting (two months after the Navy Yard shooting) that he was going to "rain down hell on EPA."

40. Plaintiff expects that discovery will reveal that Mr. Reeder was aware of multiple females' complaints of intimidating behavior by Steven Williams, yet Mr. Reeder nonetheless recommended that no corrective action be taken and then portrayed Plaintiff to the DoD investigators as pursuing an EEO complaint primarily for monetary gain rather than to correct Steven Williams' conduct.

41. Agent Heller further expects discovery to reveal that Mr. Reeder disregarded the recommendations of an independent threat assessment conducted regarding Steven Williams at the urging of the violence prevention coordinator.

    41.1. It is expected that the independent report will turn out to have included findings such as that Steven Williams was perceived (by persons other than Plaintiff) to be intimidating, volatile, confrontational, and hostile.

42. Agent Heller expects discovery to confirm that Mr. Reeder was aware of at least two females other than Plaintiff who complained of Steven Williams' mistreatment of them and was specifically aware that a female employee notified him (Reeder) that she was in a hostile work environment due to intimidation by Steven Williams.

43. When John Reeder met with one of these other complaining females, he admitted that other people within EPA had complained to him that they were bullied by Steven Williams, but said he did not personally feel bullied. He suggested the problem be fixed by making Williams more aware of how he is perceived by others.

44. Either Mr. Reeder did not share with DoD OIG the multiple other complaints about Steven Williams' intimidating behavior and the independent threat assessment or DoD chose to ignore them due to the influence of EPA.

45. Reeder's failure to disclose to DoD OIG that he readily admitted in another context to having received bullying complaints about Steven Williams is consistent with Mr. Reeder's lack of candor as to serial sexual harasser Peter Jutro. When EPA OIG first met with Reeder about allegations against Jutro, Reeder chose not to disclose he already was aware of a complaint about Jutro's behavior.

46. The failure by John Reeder and other EPA upper management to disclose to EPA OIG in August 2014 this relevant information about Mr. Jutro's conduct created an opportunity for Mr. Jutro to victimize additional females and extended the period Jutro was able to remain on paid leave.

47. In follow-up to testimony to the U.S. House Oversight and Government Reform Committee by Plaintiff and EPA officials about OIG matters, Steven Williams' attorney sent a letter to Congress about the testimony of then-Deputy Administrator Bob Perciasepe. The letter complained that Perciasepe had "volunteered that employees within OHS have made claims against Mr. Williams alleging that he has contributed to a hostile work environment for them. It is most distressing that Mr. Perciasepe would publicly raise those allegations, which have

not been aired out within EPA."[9] In other words, even Steven Williams does not deny there were multiple complaints about his engaging in appropriate conduct.

48. While in other circumstances an outside investigation like the one conducted by DoD OIG might provide an independent basis on which to discipline an employee, that is not the case here. Instead, it appears that the DoD investigation was unduly influenced by EPA and/or EPA OIG management and/or impaired by senior EPA management like John Reeder's lack of candor in speaking to the investigators.

49. The DoD ROI nonetheless provided a desired opportunity to get back at Agent Heller for her prior EEO complaint and settlement and to send a signal to other females at EPA who might complain, that management always gets the last word.

50. Among the reasons to conclude the DoD OIG ROI does not reflect the level of independence one might hope for and expect from such a report are these:

    50.1. It was agreed between EPA/EPA OIG/DoD OIG that the report actually was being prepared on behalf of and under the authority of EPA.

    50.2. The ROI references Plaintiff's EEO activity and includes mention of an interview with Mr. Reeder in which he says that Agent Heller's EEO complaint was dismissed and implies she was only out to get money. (As above, Reeder failed to disclose the depth and breadth of complaints about Steven Williams that would have confirmed Williams' habit and routine practice of intimidating those he worked with, particularly females.)

    50.3. The ROI does not mention that Agent Heller's EEO complaint later was settled, leaving the misimpression that the latest action was a dismissal.

---

[9] The DoD investigators apparently did not notice that Steven Williams has the same attorney as his witness Nancy Dunham, whose credibility issues are addressed below.

50.4. Agent Heller was identified as a witness for the investigation, but was tagged as a wrongdoer, as if she had been the subject of the investigation.

50.5. The ROI found Steven Williams' claim not to have acted in an intimidating manner toward Agent Heller to be entirely credible, though:

50.5.1. a subordinate of Williams' gave testimony shortly after the incident that was consistent with that of Agent Heller, only much later changing his story to assert Steven Williams was innocent; the DoD investigators chose to believe the more-recent concoction; and

50.5.2. Steven Williams has a well-documented history of acting in an intimidating manner toward EPA staff, particularly females.

50.6. In judging Steven Williams' credibility, the DoD investigators failed to look into or weigh the multiple other complaints that other females independently lodged against Williams at other times.

50.7. The investigators found former EPA attorney Nancy Dunham to be a "particularly credible witness," disregarding that EPA OIG and the U.S. House Oversight Committee raised serious concerns about her non-cooperativeness in a prior matter in which EPA employee John Beale for years took paid leave and traveled at agency expense under a bogus claim he was on CIA secret missions; DoD also ignored the fact that Williams and Dunham shared the same lawyer. As well, Dunham admitted, at the time of the disputed incident between Steven Williams and Plaintiff, Dunham was down a hall, so she could not clearly observe what took place.

50.8. EPA OIG management widely and frequently derided the DoD ROI as specious (but used its findings to take action against Plaintiff).

50.9. The ROI found it inappropriate for Agent Heller to instruct a witness in an investigation not to discuss his testimony with others, though the DoD investigators were provided with documents showing that the Department of Homeland Security gives similar warnings; in fact, these DoD investigators themselves told Mr. Reeder that if anyone asked him about their interview of him, to respond that he was "not at liberty to discuss what we talked about" (transcript at 30:11-13).

50.10. The ROI documented, but did not weigh in its conclusions, that a senior OIG official (not Plaintiff) relayed to the DoD investigators that "a lot of people have told me they questioned whether Mr. [Steven] Williams is sane. They think he may have some mental issues because he's so volatile and so eruptible and volcanic at times" (transcript at 37:13-15).

50.11. The ROI failed to weigh discrepancies in the testimony of pro-Steven-Williams witnesses, such as attorney Nancy Dunham's acknowledgement that Agent Heller introduced herself to Steven Williams the night of the incident, versus John Reeder's telling the DoD investigators that Williams denied Heller introduced herself.

50.12. The ROI fails to address the mitigating factor that Plaintiff followed the direction of OIG management and what was relayed from counsel as to the right of an interviewee to an attorney and use of a non-disclosure form.

51. The fact that DAIG Allan Williams claims his decision to take action against Agent Heller was made without knowledge of her prior EEO activity raises serious doubts about his credibility. After all:

51.1. in relying on the ROI to justify his action against Agent Heller, DAIG Williams surely read the testimony of Deputy Chief of Staff John Reeder running down Agent Heller's EEO activity and suggesting she was motivated primarily by money;

51.2. DAIG Williams likewise would have seen the documentation of Agent Heller's EEO complaint included as one of the DoD ROI's exhibits, with a reference in the index to documentation of her EEO complaint;[10]

51.3. in a meeting with DAIG Williams prior to the one in which he issued the counseling and related documentation, Agent Heller had mentioned her earlier EEO complaint;

51.4. it is very unlikely that DAIG Williams could have been ignorant of Plaintiff Heller's earlier EEO complaint about a GS-15-level management official (Steven Williams) when it was pending and then settled, given that he was her second-line supervisor and sat on the panel with her when she testified about related events to the U.S. House Oversight Committee, with the testimony receiving front-page media coverage;[11] and

51.5. in contradiction to his later testimony under oath to the EEO investigator for Agent Heller's most recent complaint, DAIG Williams is documented as

---

[10] Discovery will confirm that DAIG Williams had multiple discussions and meetings with other staff about Plaintiff's EEO complaint.

[11] *See, e.g.,* "Investigator to testify EPA officials obstructed probe-Visit to agency office results in a filing of an assault complaint," *Washington Times,* May 4, 2014 (http://www.washingtontimes.com/news/2014/may/4/investigator-to-testify-epa-officials-obstructed-p/).

      having told the EEO Counselor "he was aware [Agent Heller] had a prior EEO, but was not aware of the details of the complaint" (EEO ROI at 8).

52. DAIG Williams originally directed that documentation of the counseling be placed in Special Agent Heller's official personnel file (later having it moved to the supervisor's performance file after she objected).

53. EPA disciplinary policy has no provision for an "oral counseling" with written documentation; DAIG Williams later described what had been done as instead an "Oral Admonishment."

54. EPA Assistant Inspector General for Investigations Patrick Sullivan approved, or at least was aware of and did not object to, Special Agent Heller's following up her interview of a witness by pursuing him to get his signature on a non-disclosure form, yet this was one of the grounds raised for the counseling.

55. DAIG Williams defended his involvement in the disciplinary process for Plaintiff Heller in part on the basis that he played a limited role in the underlying investigation that Plaintiff Heller was conducting, yet emails from the period indicate he was involved to the point of reviewing questions to be asked of the witness whose interview led to the later confrontation of Special Agent Heller by Steven Williams (Office of Homeland Security).

56. Though they later were to find Agent Heller acted inappropriately in advising a witness not to discuss his interview with others, at the time the DoD agents interviewed Agent Heller about the issue she explained she saw it as a time-sensitive emergency, and one of the DoD agents responded, "right answer."

57. Plaintiff by email the night of the October 2013 incident at issue outlined for DAIG Williams and other senior EPA OIG management what happened and what she

had done. Nothing prevented OIG management from counseling or reprimanding her then, other than management's conclusion she had done nothing wrong. It was not until March 2014 that EPA OIG and DoD OIG entered into a memorandum of understanding for DoD OIG to investigate the incident.

58. EPA OIG has advised EPA management in the past that if EPA management believes it has a reason to take corrective action as to an employee, it should proceed to do so, rather than waiting out an OIG investigation. There is no reason the same principle would not have applied to EPA OIG disciplining Plaintiff.

59. As a final example of the harm resulting from the EPA's actions, consider that the *Giglio/Lewis* Questionnaire (November 2015 version) used by AUSAs in the U.S. Attorney's Office for the District of Columbia includes as question 9 whether a finding has been made against the law enforcement agent in a criminal/civil/administrative matter that (among other things) the agent "Failed to follow requirements for the collection and handling of evidence, obtaining statements..." Plaintiff arguably thus must disclose the (erroneous) finding in the counseling letter issued to her by DAIG Williams that she improperly communicated with someone represented by counsel.[12]

---

[12] Had the DoD OIG investigation of the October 2013 events not been adversely influenced by EPA, it would have found that Plaintiff's advising the employee not to discuss his prior EPA OIG interview with others [i.e., other than the employee's lawyer, who had left the building] was consistent with what EPA OIG management directed her to do and with EPA OIG standard practice, and was no more alarming than the DoD OIG investigators' having told Mr. Reeder after they interviewed him that he should respond to inquiries about the interview by saying that he (Reeder) was "not at liberty to discuss what we talked about."

## VII. DAMAGES AND RELIEF SOUGHT

60. As a result of the actions of the Defendant, and in spite of Plaintiff's mitigating her damages to at least the minimum extent necessary under law, Plaintiff has suffered losses justifying the granting of one or more of the following:

    60.1. equitable relief, such as a declaration that the Defendant violated Title VII, with an order that she regularly report to the Court on efforts to avoid such conduct in the future;

    60.2. retroactive voiding of the issuance of the letter of counseling and the record of it that may remain in her file;

    60.3. an award of compensatory damages for one or more of future pecuniary losses; plus past and future emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

    60.4. an award of reasonable and necessary attorney fees, expenses, and costs under Title VII and other provisions of the Civil Rights Act and, in the unlikely event not available there, under the Equal Access to Justice Act;

    60.5. an award of pre-judgment and post-judgment interest, and any other relief found by the Court to be appropriate.

61. Plaintiff requests that the Court deny Defendant relief of any kind.

## VIII. JURY REQUEST

62. Plaintiff requests a trial by jury as to all issues not reserved by law for the court.

## IX. PRAYER

ON THESE GROUNDS, Plaintiff respectfully asks that she be granted the relief sought and that judgment be entered in her favor and against Defendant.

Respectfully Submitted,

SCHLEICHER LAW FIRM, PLLC
1629 K Street, NW, Ste. 300
Washington, DC 20006
(202) 540-9950
(202) 683-6130 fax

1227 N. Valley Mills Dr., Ste. 208
Waco, TX 76710
(254) 776-3939
(254) 776-4001 fax


By: */s/ David R. Schleicher*
    David R. Schleicher
    DC Bar No. 428001
    david@gov.law

ATTORNEYS FOR PLAINTIFF HELLER