# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ELIZABETH HELLER**,

Plaintiff,

v.

Case No. 1:16-cv-02302 (TNM)

**ARTHUR ELKINS** *et al.*,

Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Agent Elizabeth Heller is a good investigator, by all accounts. Her investigation of the Environmental Protection Agency's Office of Homeland Security put her on the front line of a shameful turf war between that office and her employer, the Agency's Office of Inspector General. During the investigation, Agent Heller committed what was later deemed a minor policy infraction. Although she acted with the knowledge and implicit consent of her superior, she received an oral counseling that resulted in personal distress and may have caused professional harm.

Agent Heller sued the heads of the EPA and its Office of Inspector General in their official capacities, claiming that the reprimand was retaliation against her in violation of Title VII for lodging a sex discrimination complaint against an Agency employee. But Agent Heller failed to establish at trial a causal link between her sex discrimination complaint and the oral counseling. She also failed to show that her employer acted with intent to retaliate instead of in a good-faith belief that she had violated Agency policy. Because a causal link and retaliatory

animus are necessary elements of Agent Heller's Title VII claim, the Court will enter judgment in favor of the Defendants.

## I. FINDINGS OF FACT[1]

Agent Heller filed this lawsuit in federal court in November 2016 after exhausting her administrative remedies. Compl. ¶ 2.[2] She sued Gina McCarthy in her official capacity as then-Administrator of the EPA. Compl. ¶ 3. Andrew Wheeler, the current Acting Administrator of the Agency, is automatically substituted in her place. Fed. R. Civ. Pro. 25(d). Agent Heller filed a Supplemental Complaint in June 2018, adding the Agency's Inspector General, Arthur Elkins, as a defendant in his official capacity. In July 2018, the Court held a three-day bench trial. Agent Heller testified on her own behalf and called five other witnesses. Minute Entries dated 7/17/18, 7/18/18, and 7/19/18. The Government called some of the same witnesses and two witnesses of its own. *See* 7/17/18 Tr. 69:14-17; Minute Entries dated 7/17/18, 7/18/18, and 7/19/18.

### A. Agent Heller Was the Casualty of an Inter-Office Turf War

During the time at issue, there was considerable tension between the Agency's Office of Inspector General, or OIG, and its Office of Homeland Security, or OHS. 7/18/18 Tr. 136:19-24 (A. Williams). OHS was collaborating with the FBI on intelligence-related activities even though OIG staff believed they should take the lead, at least where the FBI's investigations involved EPA employees or contractors. *Id.* at 39:16-40:1. And although OIG refused to

---

[1] The Court's findings of fact are based on the testimony and exhibits introduced at trial. They focus on the facts and evidence necessary to the Court's legal analysis and for context but are not exhaustive.

[2] The Court has jurisdiction under 28 U.S.C. § 1346 because the defendants are federal officials sued in their official capacity and 28 U.S.C. § 1331 because the action arises under federal law.

approve a Memorandum of Understanding between OHS and the FBI, OHS agents signed individual nondisclosure agreements with the FBI that prompted them to withhold information that OIG believed it had a right to obtain. *Id.* at 40:2-18. As Agency Deputy Chief of Staff (DCOS) John Reeder put it, "there was a turf war between these offices." 7/17/18 Tr. 225:10-11 (Reeder).

Agent Heller stepped into the thick of this conflict when OIG assigned her to investigate whether OHS had violated Agency policy and obstructed justice by failing to notify OIG of allegations against an Agency employee and instead working with the FBI to investigate the allegations without OIG involvement. Ex. J22 at EPA 0012 (DOD ROI); *see also* Pl.'s Proposed Findings of Fact ¶ 3. On October 24, 2013, Agent Heller and her colleague, Agent Ryan Smith, interviewed an OHS employee named John Martin, with Mr. Martin's counsel present. 7/17/18 Tr. 98:13-99:10 (Sullivan); Ex. J22 at EPA 0013. This interview was the culmination of at least two months of inter-office wrangling as to whether and how this interview should occur. 7/17/18 Tr. 98:17-99:21 (Sullivan). But Mr. Martin and his attorney left the interview *in medias res*, over the agents' objections, citing a need to handle child care issues. *Id.* at 100:17-22; Ex. J22 at EPA 0014.

Immediately after Mr. Martin and his attorney left, Agent Heller went to Assistant Inspector General for Investigations (AIGI) Pat Sullivan and told him how frustratingly uncooperative Mr. Martin had been. 7/17/18 Tr. 101:21-25 (Sullivan). AIGI Sullivan was and is a high-level manager in OIG. He asked her if she had gotten Mr. Martin to sign a nondisclosure form prohibiting discussion of details about the interview with other witnesses at OHS. *Id.* at 101:25-102:3. Agent Heller realized she had not and told AIGI Sullivan that she would go get the signature right away. *Id.* at 102:4. AIGI Sullivan did not expressly direct Agent Heller to go

and get Mr. Martin's signature, but he had the authority to stop her if he wanted to and would have stopped her if he thought that going to get the signature was against Agency policy. *Id.* at 102:5-19; 192:9-15. But AIGI Sullivan did not think there was anything wrong with Agent Heller's plan, and he considered it "vital" to get the form signed. *Id.* at 102:8-12; 192:20-193:4.

Approaching Mr. Martin apart from his counsel was arguably a violation of OIG Policy 207, which states, "OIG policy permits an employee who is not in custody to have an attorney present at an interview if the employee so requests." Ex. J11 at EPA 00436-37. But AIGI Sullivan believed that, as OIG has since amended its policy to clarify, having an attorney at a non-custodial interview is a courtesy and not a right. 7/17/18 Tr. 104:2-13 (Sullivan).[3] Agent Heller had heard him express this view and attribute it to OIG counsel. 7/19/18 Tr. 54:23-55:14 (Heller). AIGI Sullivan testified that, by allowing Agent Heller to go without raising any objection, he implicitly approved her effort to get Mr. Martin's signature. 7/17/18 Tr. at 192:16-20 (Sullivan). The Court agrees.

After her conversation with AIGI Sullivan, Agent Heller tried unsuccessfully to contact Mr. Martin's attorney by phone and then went with Agent Gary Don Dorman to look for Mr. Martin at OHS. 7/19/18 Tr. 51:25-52:4; 95:10-96:6 (Heller). As they entered OHS's office suite, Agent Heller heard Mr. Martin talking about specific information from the interview with Nancy Dunham, from the Agency's Office of General Counsel, and with Senior Intelligence Advisor (SIA) Steve Williams, who worked for OHS. *Id.* at 52:4-8. Mr. Martin asked what the agents wanted, and Agent Heller explained that they needed a moment to address one follow-up item. *Id.* at 52:14-17. He said that he did not want to discuss anything without his attorney

---

[3] AIGI Sullivan also did not believe that any right to counsel at an interview attached when Agent Heller simply tried to have Mr. Martin sign a form and told him he should not discuss the interview with others. *Id.* at 106:3-20.

present.  *Id.* at 52:18-20.  Agent Heller tried to explain that he should not discuss details about the interview with anyone other than his attorney, but Ms. Dunham and SIA Williams shouted that Agent Heller was wrong.  *Id.* at 53:1-15.  Mr. Martin never signed the form.  *Id.*

SIA Williams appears to have harbored a hostile attitude toward OIG generally.[4]  The evidence suggests that he behaved in an aggressive and unprofessional way in this instance. Agent Heller testified at a congressional hearing that SIA Williams yelled at her so loudly that it was difficult to understand what he was saying.  Ex. J22 at EPA 0090  She also testified that SIA Williams "repeatedly jabbed his finger at me, merely inches from my chest, and as he got more aggressive, his complexion heated, his veins bulged, and he began to sweat profusely."  *Id.* According to Agent Heller, when she stepped back and tried to introduce herself, SIA Williams refused to shake her hand and stated, "I don't want to know you."  *Id.* at EPA 0091.

### B.  The Office of Inspector General Supported Agent Heller

When Agent Heller returned to OIG from her unsuccessful visit to OHS, she was emotional and physically shaken.  7/17/18 Tr. 75:17-20 (Kaminsky).  She reported SIA Williams's interaction with her as an assault, and AIGI Sullivan responded by immediately sending four other agents back to OHS to investigate what had happened.  7/17/18 Tr. 108:1-10 (Sullivan).  They had another confrontation with SIA Williams, but not as serious.  *Id.* at 108:11-14.  One of the agents wanted to arrest SIA Williams at once, but AIGI Sullivan decided that

---

[4]  Deputy Assistant Inspector General for Investigations (DAIGI) Allan Williams testified that he believed SIA Williams intentionally kept documents from OIG even when they clearly fell under OIG's investigatory authority.  7/18/18 Tr. 137:2-4 (A. Williams).  DAIGI Williams also testified that SIA Williams would refuse to acknowledge the existence of OIG staff at meetings where they were present.  *Id.* at 137:5-17.  OIG Counsel Alan Larsen testified that he was speaking with someone at another meeting when SIA Williams suddenly turned to him and stated, "I don't like you"—the first words SIA Williams had ever spoken to Mr. Larsen.  7/19/18 Tr. 144:16-24 (Larsen).  At a later meeting, Mr. Larsen greeted SIA Williams and tried to shake his hand, but SIA Williams told him, "I don't want to shake your hand."  *Id.* at 145:6-12.

OIG should investigate the issue with help from the Federal Protective Service, or FPS, and then present it to the United States Attorney's Office for potential prosecution. *Id.* at 108:14-109:19.

A month later, Agent Heller filed an Equal Employment Opportunity complaint, or EEO, against the EPA, alleging that SIA Williams had mistreated her during their encounter on October 24 because of her sex and noting that he had not treated the male agent with her in the same way. Ex. J22 at EPA 0796-98 (EEO complaint and attachment). Her colleagues at OIG were concerned about her, and she did not keep her complaint a secret from them. 7/17/18 Tr. 52:20-53:7 (Kaminsky); 7/19/18 Tr. 60:2014 (Heller). AIGI Sullivan testified that she discussed the complaint with him and that he supported her as she went through the EEO process. 7/17/18 Tr. 113:7-21, 114:1-3 (Sullivan). Agent Heller testified that she felt he supported her and that she tried to keep him and other OIG managers informed about the progress of her complaint. 7/19/18 Tr. 60:7-10, 15-17 (Heller).

### C. The Department of Defense Conducted an Independent Investigation

Word quickly spread about the altercation. Four days after Agent Heller's encounter with SIA Williams and nearly a month before she filed her EEO complaint, Gina McCarthy, the EPA's Administrator, wrote a letter to the leadership of OIG and OHS about the incident. Ex. J46 at 12-13. Her letter noted the damaging consequences of "the growing discord, distrust, and conflict between members of your respective Offices," requested that OIG "temporarily halt its review" of OHS's conduct, and stated that she wanted FPS to handle the investigation. *Id.* Even though the Inspector General has significant independence from the Administrator, OIG voluntarily stopped investigating the incident and left it to FPS. 7/17/18 Tr. 109:20-25 (Sullivan). FPS investigated and then referred the assault charge to a federal prosecutor, but the

prosecutor declined the case and sent it back to OIG to handle administratively.  Ex. J22 at EPA 0068, EPA 0071-76.

Because the incident involved one of EPA OIG's own employees and OIG wanted to avoid the appearance of partiality, OIG asked an umbrella organization called the Council of Inspectors General to find another agency's OIG to conduct the investigation.  7/19/18 Tr. 153:12-154:2.  The Council approached the Department of Defense OIG, or DOD OIG, which entered a Memorandum of Understanding with the EPA and EPA OIG.  Ex. J22 at EPA 0078. Under this agreement, DOD OIG agreed "to conduct a thorough and professional investigation of all facts and circumstances relating to the allegations of employee misconduct arising out of" the incident between Agent Heller and SIA Williams.  *Id.* at EPA 0078-79.

DOD OIG assigned Agents Andrew Dunphy and Jason Suffredini to the investigation, which lasted about 18 months and involved gathering documents and interviewing several Agency and OIG employees, including Agent Heller and AIGI Sullivan.  7/19/18 Tr. 19:13-20:19, 21:14-22:2 (Dunphy); Ex. J22 at EPA 0059-61.  The agents consulted with DOD OIG Counsel Mark Boyll, who provided legal analysis and reviewed their draft Report of Investigation.  7/19/18 Tr. 19:16-21, 20:1-6, 20:14-19 (Dunphy).

One of the people whom Agents Dunphy and Suffredini interviewed was DCOS Reeder. Agent Heller argues that DCOS Reeder retaliated against her for her EEO activity by influencing the investigators against her.[5]  She emphasizes that he sought out a meeting with DOD OIG even

---

[5]  Agent Heller's main argument that DCOS Reeder was unhappy about her EEO activity has to do with circumstances surrounding the settlement of her complaint, which he apparently reluctantly approved.  Proposed Findings of Fact ¶ 42.  But he had no contact with DOD OIG after the settlement.  *See* 7/18/18 Tr. 30:1-23 (Reeder); 7/19/18 Tr. 26:11-22 (Dunphy).  Agent Heller also asserts that DCOS Reeder was unhappy because it embarrassed him that she had complained about one of his subordinates, although DCOS Reeder worked in the Administrator's Office and SIA Williams worked at OHS.  Pl.'s Proposed Findings of Fact ¶¶ 42; Ex. J27.

though he was not a witness to the event, mentioned her EEO complaint to the investigators, told

them that she had suggested a settlement, and sent them materials related to the EEO. Pl.'s

Proposed Findings of Fact ¶¶ 53, 57-58, 86 (citing Ex. J22 at EPA 0775-76, EPA 0844-72).[6] But

he did not mention her EEO activity until the interview was concluding and the agents asked him

an open-ended question about whether there was anything else he knew. Ex. J22 at EPA 774.

Even then, he only mentioned it after agents asked him a series of questions to follow up on his

apparently off-hand comment that he had once met with Agent Heller. Ex. J22 at EPA 0774-76.

If DCOS Reeder had wanted to harm Agent Heller and had thought that mentioning her

EEO activity could help him do that, it seems unlikely that he would have waited so long to

mention it. And it is unclear how DCOS Reeder could have thought that mentioning the EEO

would harm Agent Heller since the EEO had nothing to do with the alleged policy violations that

DOD was investigating. *See* 7/19/18 Tr. 13:1-15, 43:19-23 (Dunphy) (testifying that Agent

Heller's EEO complaint did not affect the DOD's findings about her policy violation). DCOS

Reeder testified emphatically that he has not retaliated against anyone for using the EEO process,

which he took pride in having promoted and improved. 7/18/18 Tr. 34:9-36:9 (Reeder). The

Court finds that DCOS Reeder did not act with retaliatory intent.[7]

Even if DCOS Reeder had intended to retaliate against Agent Heller by influencing the

DOD investigation against her, he was unsuccessful. Agent Dunphy testified that DCOS Reeder

appeared to have "an agenda" during the interview but noted that this agenda was "related to his

---

[6] DCOS Reeder denied initiating the interview but remembered mentioning to EPA Chief of
Staff Matt Fritz at one time that he had not been interviewed. 7/17/18 Tr. 203:2-22 (Reeder).
Agent Dunphy credibly testified that Mr. Fritz told him DCOS Reeder wanted to be interviewed.
7/18/18 Tr. 189:3-6. The Court finds that DCOS Reeder sought out the interview.

[7] At trial, Agent Heller elicited testimony about various unrelated matters involving DCOS
Reeder and/or SIA Williams. The Court found this evidence to be of little relevance to this case.

grievances against the OIG," not to Agent Heller's EEO activity.  7/19/18 Tr. at 31:2-5; *see also id.* at 11:7-12:8 (describing the perceived grievances DCOS Reeder shared); *id.* at 36:20-37:20 (noting that tensions between OHS and OIG had led to tensions between the EPA Administrator's Office and OIG and that this problem predated Agent Heller's EEO activity). Agent Dunphy credibly testified that DCOS Reeder's agenda did not affect the conclusions of the DOD Report of Investigation and that he would have made the same recommendations even if he had never met with DCOS Reeder.  *Id.* at 36:12-19.  Although Agent Dunphy included EEO-related materials in the exhibits to his Report of Investigation and made a brief reference to the EEO complaint, they simply served to confirm that Agent Heller's description of her encounter with SIA Williams had stayed consistent over time.  *Id.* at 13:10-15.

A draft of DOD OIG's Report of Investigation found that Agent Heller had not engaged in any misconduct.  Ex. J38.  But this tentative finding changed after the DOD agents discussed the draft with DOD OIG Counsel Mark Boyll.  7/18/18 Tr. 199:1-11 (Dunphy).[8]  The final Report of Investigation, which included a 56-page narrative and nearly 1,000 pages of exhibits, made two findings against Agent Heller.  Ex. J22.  It found that Agent Heller acted negligently by telling Mr. Martin that he should not to discuss details of his interview with anyone other than his attorney and that she violated EPA OIG Policy 207 by communicating with Mr. Martin when his attorney was not present.  *Id.* at EPA 0004.  The Report also found that her colleague, Agent

---

[8]  Agent Heller emphasizes that one of Mr. Boyll's contacts at the EPA was the Agency's General Counsel, Avi Garbow.  Pl.'s Proposed Findings of Fact ¶ 67.  Mr. Garbow is one of the individuals she accuses of holding retaliatory animus against her because of her EEO complaint. *Id.* ¶ 175.  Agent Heller notes that Mr. Garbow was aware of her EEO activity at least at some time but offers no evidence to suggest that he influenced Mr. Boyll's advice to Agent Dunphy or had any reason to view Agent Heller's EEO complaint negatively.  *Id.* ¶ 67.  Neither party called Mr. Boyll or Mr. Garbow as witnesses.

Smith, had committed a policy violation.  *Id.* at EPA 0005.  It did not sustain any of the allegations against SIA Williams.  *Id.* at EPA 0004-05.

The Court finds that the DOD OIG Report of Investigation was completed without improper influence from either EPA OIG or EPA headquarters.

### D.  DAIGI Williams Conducted an Independent Investigation

EPA OIG Agent Mark Kaminsky testified at trial that EPA OIG management received the DOD OIG's Report of Investigation with consternation, adding that management was unhappy with how DOD conducted the investigation and with the findings it made.  7/17/18 Tr. 50:19-51:2, 56:21-24 (Kaminsky).  He also testified that he expressed concern to AIGI Sullivan and DAIGI Williams about the fact that the Report included a brief reference to Agent Heller's EEO activity, warning that it might seem retaliatory.  *Id.* at 51:6-52:9.[9]  AIGI Sullivan asked Agent Kaminsky to develop a rebuttal to the DOD Report, but Inspector General Elkins ultimately decided that OIG would not submit a rebuttal.  7/17/18 Tr. 145:5-9 (Sullivan).

AIGI Sullivan assigned DAIGI Williams to decide what steps, if any, OIG should take in response to the findings against Agent Heller.  *Id.* at 130:12-19.  He chose DAIGI Williams because he was the only senior member of OIG's staff in the District of Columbia who had not been involved the night of the confrontation between Agent Heller and SIA Williams.  *Id.* at 132:13-17.  Although AIGI Sullivan did not formally recuse himself, he told DAIGI Williams not to discuss the situation with him and to make the decision in consultation with counsel and with Human Resources.  *Id.* at 130:7-19.  This was because he considered himself to have been "intimately involved" as a hearsay witness who had heard and believed Agent Heller's story.  *Id.*

---

[9]  Agents Kaminsky and Heller are now married, a fact that the Court considered when evaluating Agent Kaminksy's testimony.

at 130:14-15, 130:22-131:5; *see also id.* at 165:2-9 (noting that Agent Heller was a personal friend and that he had invited her to his wedding). By the time that AIGI Sullivan gave him this assignment, DAIGI Williams knew that AIGI Sullivan disagreed with the Report and thought that Agent Heller should not be disciplined. *Id.* at 131:10-12; 7/18/18 Tr. 90:1-17 (A. Williams). That said, DAIGI Williams understood that AIGI Sullivan wanted him to form his own views and act independently. *Id.* at 90:18-25. Thus, the Court finds that AIGI Sullivan likely had no influence on DAIGI Williams's decision and that any influence he may have unintentionally exerted would have been in Agent Heller's favor.[10]

DAIGI Williams testified that he conducted an independent review of the Report's findings, without influence from anyone at the Administrator's Office or in his chain of command. *Id.* at 168:9-169:2. He did not simply rely on the Report's findings, but reviewed documents, conducted interviews, and consulted with EPA OIG Counsel Susan Charen. *Id.* at 93:4-7; 143:16-144:5; Ex. J11 at EPA 00433-37. Ultimately, he disagreed with the Report's finding that Agent Heller had committed negligence but agreed that she had violated Policy 207. *Id.* at EPA 00436-37. He also upheld the Report's finding against Agent Smith. *Id.* at 00437.[11] That he did not uphold all the findings against Agent Heller and that he did uphold the finding

---

[10] Agent Kaminsky testified that AIGI Sullivan took a clear position, which DAIGI Williams echoed, that "something had to be done" about the DOD's Report, even though AGIGI Sullivan disagreed with the Report. 7/17/18 Tr. 57:23-58:14 (Kaminsky). Although he never heard AIGI Sullivan specify what action he had in mind, Agent Kaminsky testified that he understood that some disciplinary action was necessary. *Id.* at 73:3-74:22. The Court disagrees with this assumption. The Court found AIGI Sullivan to be a highly credible witness. Where his testimony was disputed by Agents Kaminsky or Heller, the Court credited him. The more relevant and credible testimony is AIGI Sullivan's statement that, although he did not recall using those words, he did recall thinking that OIG had to craft a response involving new trainings and changes to OIG policies and procedures. 7/17/18 Tr. 131:13-24.
[11] DAIGI Williams took no action on the DOD Report's finding against Agent Smith because Agent Smith no longer worked at the EPA. 7/17/18 Tr. 94:7-14 (Sullivan).

against an employee who had not engaged in EEO activity suggest that he was not simply retaliating against Agent Heller for her EEO complaint or acting under the guidance of others who desired to retaliate.

DAIGI Williams's finding against Agent Heller reflected his belief that Policy 207 conveyed a right to counsel that she inadvertently violated when she approached Mr. Martin outside the presence of counsel to have him sign the nondisclosure agreement. *Id.* at EPA 00436-37. He believed that getting the signature was a continuation of the interview, in part because Agent Heller had tried to contact Mr. Martin's counsel before approaching Mr. Martin for the signature. *Id.* at EPA 00436; 7/18/18 Tr. 144:14-148:25 (A. Williams). DAIGI Williams's interpretation of Policy 207 is plausible and the Court does not doubt that he made it in good faith. But other interpretations of the policy are also plausible and had been articulated to Agent Heller by OIG management as the view of OIG counsel. 7/19/18 Tr. 54:23-55:14 (Heller). In this context, AIGI Sullivan's implicit approval as a member of OIG's management should have exculpated Agent Heller from any impropriety in approaching Mr. Martin about nondisclosure.

### E.  DAIGI Williams Gave Agent Heller an Oral Counseling

DAIGI Williams determined that Agent Heller had not intentionally violated Policy 207 but that he should give her a nonpunitive oral counseling. 7/18/18 Tr. 119:9-16 (Williams). DCOS Reeder never communicated with DAIGI Williams about this decision or encouraged others at the Agency to influence OIG's response to the DOD's Report. 7/18/18 Tr. 37:19-38:3 (Reeder). The Administrator's Office did pressure OIG counsel to say what steps OIG would take in response to the Report, although the idea of discussing the appropriate response may have originated with OIG counsel. 7/19/18 Tr. 160:20-164:9 (Larsen); Ex. J46 at 56. But DAIGI

Williams was unaware of anyone at the Administrator's Office having communicated with OIG or holding any views on what steps OIG should take in response to the DOD's Report. 7/18/18 Tr. at 168:9-18 (A. Williams).[12] He also testified that it would not have mattered to him what anyone else thought, pointing out that he felt comfortable disregarding the views of his supervisor, AIGI Sullivan, by upholding one of the findings against Agent Heller. *Id.* at 168:18-169:2. Any pressure from those outside of his chain of command was certainly unavailing. Like DAIGI Williams, AIGI Sullivan testified that he was unaware of any evidence that the Administrator's Office had influenced OIG to act against Agent Heller. 7/17/18 Tr. 125:7-17 (Sullivan).

Agent Heller testified that DAIGI Williams counseled Agent Heller about Policy 207 for over two hours, although DAIGI Williams testified that he had thought the discussion was shorter. 7/19/18 Tr. 70:24-71:5; 7/18/18 at 111:13-20 (A. Williams). DAIGI Williams recalled the discussion being emotional for Agent Heller. *Id.* at 111:10-12. On the advice of counsel, DAIGI Williams documented the oral counseling with a memorandum to her supervisor's file. *Id.* at 158:17-24. Because counsel's initial instructions were ambiguous about what file the memorandum should go to, he almost had the memorandum placed in Agent Heller's electronic official personnel folder, but he discovered the mistake and corrected it before the memorandum ever reached that file. *Id.* at 158:9-159:5.

---

[12] Administrator McCarthy sent a letter to the Inspector General on October 15, 2015, suggesting that he consider whether the Report triggered external reporting obligations, including possible obligations to report to the Attorney General or to notify the Central Intelligence Agency of misconduct by any individuals who held security clearances. Ex. J46 at 92-93. But DAIGI Williams had already decided the day before to give Agent Heller an oral counseling. Ex. J12. This letter therefore had no impact on DAIGI Williams's decision.

After the oral counseling, Agent Heller asked DAIGI Williams if their conversation had *Giglio* implications—that is, whether she would have to disclose it to prosecutors as potential impeachment evidence about her in subsequent testimony. 7/19/18 Tr. 65:20-66:10 (Heller); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972) (applying *Brady* disclosure requirements to "evidence affecting credibility"). Notably, the issue of *Giglio* impairment was raised by her, not him. AIGI Sullivan, Agent Dunphy, a Department of Justice Senior Trial Attorney, and counsel for the Defendants all agreed at trial that the oral counseling and the underlying finding of a policy violation do not affect Agent Heller's credibility. 7/17/18 Tr. 139:20-141:19 (Sullivan); 7/18/18 Tr. 69:9-71:6 (Korzenik); 7/18/18 Tr. 202:20-203:2 (Dunphy); 7/19/18 Tr. 211:17-21 (Pfaffenroth). They are correct.

But because prosecutors bear the responsibility of deciding whether to make a *Giglio* disclosure to a defendant, OIG counsel advised DAIGI Williams that OIG lacked authority to decide whether the counseling raised a *Giglio* issue and that this was a question that a prosecutor would need to address. 7/18/19 Tr. 130:10-18, 160:16-161:21 (A. Williams); *see also* Ex. J4. DAIGI Williams told Agent Heller she should disclose the counseling and let a prosecutor decide how to handle it. 7/18/19 Tr. 113:15-18 (A. Williams). But he added that if she had any issues with a prosecutor he would talk with the prosecutor by phone or fly out to meet in person because he viewed her violation as a minor infraction. *Id.* at Tr. 113:18-21. Until OIG Counsel Larsen testified at trial that he considered her free to ignore that advice, Agent Heller understood herself to be obligated to disclose the oral counseling to every prosecutor with whom she worked. *See* 7/19/18 Tr. 171:11-18 (Larsen); 7/19/18 Tr. 68:13-21 (Heller).

**F.  The Oral Counseling Harmed Agent Heller**

DAIGI Williams's oral counseling and advice about potential *Giglio* impairment affected

Agent Heller.  It prompted her to avoid projects that might require her to testify in court.  *Id.* at

68:22-69:1.  It also made her feel limited in her ability to pursue jobs and career enhancement

opportunities that would involve frequent testimony in court.  *Id.* at 68:7-69:24; 7/17/18 Tr.

65:11-17 (Kaminsky).  On the other hand, the Court does not agree with the suggestion that

*Giglio* issues are analogous losing a professional license.  *See* 7/17/18 Tr. 142:18-21 (Sullivan)

(responding to counsel's comparison by saying that there is "a rough analogy").  Without the

requisite license, a doctor cannot practice medicine nor may an attorney practice law.  But after

receiving the oral counseling, Agent Heller—with support from AIGI Sullivan as a reference—

got a higher-level federal agent job elsewhere that requires her to be available to testify in court.

7/19/18 Tr. 67:23-68:1, 133:6-16 (Heller); 7/17/18 Tr. 93:6-15 (Sullivan).  She has only

disclosed her *Giglio* concerns to a single prosecutor, and he did not express concern about the

issue.  7/19/18 Tr. 112:9-20.  In fact, he testified at trial that he could see a tactical advantage in

working with an investigator who had such a minor *Giglio* concern because a defense attorney

could look silly trying to argue that the oral counseling affected her credibility as a witness.

7/18/18 Tr. 78:20-25 (Korzenik).

The personal impact of the oral counseling is harder to trace, particularly since her

emotional reaction to hearing about the DOD Report of Investigation was so strong that she had

to take time substantial time off work even before DAIGI Williams counseled her.  *See* 7/17/18

Tr. 77:4-78:5 (Kaminsky).  Agent Heller testified that she often shut the door in her office and

cried when she heard her colleagues talking about her situation.  7/19/18 Tr. 76:22-77:5 (Heller).

She said that the hardest thing for her was the sense that her managers betrayed her rather than

standing by her when they had told her everything she did was right.  *Id.* at 75:20-76:13.  She felt

generally incapacitated because of her emotional state, and she experienced what she described

as "a little bit of depression."  *Id.* at 77:8-20; *see also* 7/17/18 Tr. 65:25-66:24 (Kaminsky)

(describing Agent Heller's loss of motivation and confidence and stating that there are days she

lacks the will to even get up).[13]

## II.  CONCLUSIONS OF LAW

The *McDonnell Douglas* framework governs Title VII retaliation claims.  *Walker v.*

*Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015).  To state a prima facie case of retaliation, a

plaintiff must allege that (1) she "engaged in protected activity"; (2) she "was subjected to an

adverse employment action"; and (3) "there was a causal link between the protected activity and

the adverse action."  *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007).  If the plaintiff

states a prima facie case of retaliation, the employer then bears the burden of identifying "the

legitimate . . . non-retaliatory reason on which it relied in taking the complained-of action."

*Walker*, 798 F.3d at 1092.  If the employer provides a legitimate, non-retaliatory reason for the

adverse employment action, the burden shifts back to the plaintiff to show that the reason is

pretextual and that the employer intentionally retaliated against her.  *See McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792, 805 (1973).

### A.  Agent Heller Has Not Made Out a Prima Facie Case of Retaliation

To make out a prima facie case of retaliation, Agent Heller must show that (1) she

"engaged in protected activity"; (2) she "was subjected to an adverse employment action"; and

(3) "there was a causal link between the protected activity and the adverse action."  *See*

---

[13]  Agent Kaminsky also testified that they would like to have children but have agreed she
should avoid the stress of trying to conceive, while Agent Heller testified that they had been
trying to conceive.  *Id.* at 68:4-17; 7/19/18 Tr. 79:5-6 (Heller).

*Woodruff*, 482 F.3d at 529.  The parties agree that Agent Heller's EEO complaint against SIA Williams is a protected activity that satisfies the first element of her prima facie case.  Proposed Jury Instruction at 4.

The parties dispute whether Agent Heller has satisfied the second element by establishing that she suffered to an adverse employment action.  In the context of retaliation claims, an adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  This is an objective standard for distinguishing "significant from trivial harms" that does not depend on a plaintiff's subjective feelings and does not make actionable "those petty slights or minor annoyances that often take place at work and that all employees experience."  *Id.* at 68-69.  Although the Court does not agree with the suggestion that *Giglio* impairment is like losing a professional license, it can cause professional damage.  An agent with serious adverse credibility findings is unlikely to be called to testify by prosecutors; she may face banishment to undesirable administrative tasks instead.  *Giglio* impairment may impact a law enforcement officer's career, although there is scant evidence it did so for Agent Heller.  The Court assumes without deciding that the professional harm caused by an oral counseling followed by an instruction to disclose the counseling as a potential *Giglio* issue would dissuade a reasonable agent from engaging in protected conduct.

But Agent Heller has not satisfied the third element of a prima facie case by showing "that the employer took the action because of her protected conduct."  *See Allen v. Johnson*, 795 F.3d 34, 38-39 (D.C. Cir. 2015).  To establish causation in a Title VII retaliation case against a federal employer, a plaintiff must prove that, but for her protected conduct, the employer would not have taken the adverse employment action of which she complains.  *See id.* at 38 & 38 n.2

(applying 42 U.S.C. § 2000e–3(a) to a federal employer and noting that the Circuit construes Title VII's provisions for public-sector and private-sector employers as interchangeable); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("[A] plaintiff making a retaliation claim under § 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.").[14]

Agent Heller failed to show that her EEO complaint had a causal connection to any of the events that led to her oral counseling. *First*, the EEO complaint did not cause the DOD OIG's investigation. Agent Heller set the investigation in motion herself before filing her EEO complaint by alleging to her supervisors that SIA Williams assaulted her. The decisions that the allegation should be investigated and that EPA OIG should not be involved in the investigation were made before Agent Heller filed her EEO complaint. And there is no evidence that the EEO activity had any effect on the selection of DOD OIG to conduct the investigation. Even without the EEO activity, DOD OIG would have investigated Agent Heller's encounter with SIA Williams.

*Second*, the EEO complaint did not cause the DOD OIG's findings against Agent Heller. These findings resulted from an independent investigation. Agent Dunphy credibly testified that the complaint had no direct influence on the DOD OIG's findings and had no indirect influence through DCOS Reeder. The findings would have been the same with or without DCOS Reeder's input. And even if DCOS Reeder had influenced the investigation against Agent Heller, any

---

[14]  Agent Heller concedes that cases in this Circuit consistently apply the but-for standard. Proposed Jury Instructions 4 n.2. But she argues that there is an open question whether it is enough for her to show that her protected activity was a motivating factor for the adverse employment action, even if there were other contributing factors. Pretrial Statement 30; Proposed Jury Instructions 4 n.2, 8 n.4. Even if the motivating-factor analysis applied, the Court would still find that Agent Heller's EEO complaint did not motivate DAIGI William's decision to give an oral counseling even indirectly and in part.

animosity he felt stemmed from an inter-office turf war and not from her EEO activity. Nor has Agent Heller shown by a preponderance of the evidence that anyone else at EPA inappropriately influenced the DOD OIG because of her EEO activity.

*Third*, the EEO complaint did not influence DAIGI Williams in his investigation or in his decision to counsel Agent Heller. Even if others wished to retaliate against Agent Heller for her complaint, DAIGI Williams testified credibly and without contradiction that he did not feel and would not have given in to pressure from anyone. And he had no personal desire to retaliate. Agent Heller implicitly concedes that point by claiming that he and AIGI Sullivan were the cat's paw used against her by individuals at the Administrator's Office who harbored the retaliatory animus. *See* Pl.'s Proposed Findings of Fact ¶ 175; *see also* 7/19/18 Tr. 117:2-13, 118:19-119:15 (Heller) (stating that neither AIGI Sullivan nor DAIGI Williams showed hostility toward her EEO complaint, conceding that it would not make sense for them to take offense at her complaint against someone who was so unpopular with OIG, and clarifying that she believed they allowed themselves to become instruments to effectuate the animus of individuals at the Administrator's Office); 7/19/18 Tr. 190:3-15 (Schleicher) (disclaiming any suggestion that AIGI Sullivan or DAIGI Williams were angry about Agent Heller's EEO and agreeing that "Reeder is the one who had the intent to retaliate").[15]

---

[15]  The Court notes that Agent Heller also suggests that AIGI Sullivan and DAIGI Williams were not "purely the cat's paw." Pl.'s Proposed Findings of Fact ¶ 181. By this she appears to mean that they knew the Administrator's Office wished to retaliate against her and intentionally complied with the Administrator's Office to protect themselves. *See id.* But the desire to protect oneself differs from a personal desire to retaliate and would not make AIGI Sullivan or DAIGI Williams anything but the cat's paw. And there is no evidence suggesting that OIG management felt threatened by the Administrator's Office or felt any need to protect itself by acquiescing in its wishes.

Even without Agent Heller's concession, the Court finds that neither AIGI Sullivan nor DAIGI Williams had a desire to retaliate against Agent Heller. AIGI Sullivan considered Agent Heller a personal friend and helped her get a higher-level job after the oral counseling took place. And DAIGI Williams rejected one of the DOD Report's findings against Agent Heller, decided to give her a non-disciplinary oral counseling, and offered to fly out or at least make a phone call to explain to any prosecutor with *Giglio* concerns that Agent Heller's infraction was trivial. This is not the conduct of supervisors who are out to harm someone because of EEO activity or for any other reason.

Agent Heller's EEO complaint did not influence any of the events or decisions that led to her oral counseling.[16] Even if an oral counseling followed by an instruction to make *Giglio* disclosures about the counseling is an adverse employment action, Agent Heller has not shown that her protected activity was a but-for cause of this action. So she has failed to make out a prima facie case of retaliation. On that ground alone, her claim fails.

### B. The Defendants Have Identified a Legitimate Basis for the Oral Counseling

Even if Agent Heller had made out a prima facie case, the Defendants would be able to rebut it by identifying a "legitimate . . . non-retaliatory reason on which it relied in taking the complained-of action." *See Walker*, 798 F.3d at 1092. DAIGI Williams counseled Agent Heller because of a good-faith belief that she had violated Policy 207. And he told her that she should make a *Giglio* disclosure about the oral counseling based on the advice of OIG legal counsel. This advice reflected the fact that prosecutors are responsible to determine what information they must disclose under *Giglio*. There is no allegation and no evidence to suggest that Agent

---

[16] Agent Heller does not argue that DAIGI Williams' instruction to disclose the counseling under *Giglio* was itself an adverse employment action. Even if she did, she has not shown that there is any connection between this instruction and Agent Heller's EEO activity.

Heller's EEO activity influenced OIG counsel when it gave this advice. A reasonable, good-faith belief that an employee has violated agency policy is a legitimate, non-retaliatory reason to give a non-disciplinary oral counseling, and the advice of counsel is a legitimate, non-retaliatory reason to tell an employee she should disclose the counseling under *Giglio*.

### C. Agent Heller Has Not Shown an Intent to Retaliate

Because the Defendants have provided a legitimate, non-retaliatory reason for the allegedly adverse employment action, Agent Heller bears the burden of showing that this reason is pretextual and that the employer intentionally retaliated against her. *See Jones*, 557 F.3d at 678. A plaintiff can show that an employer intended to retaliate by showing, among other things, "evidence of discriminatory statements or attitudes on the part of the employer." *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016).

If the individual who took an adverse employment action against the plaintiff had no personal desire to retaliate, the employer can still be liable under what is called a "cat's paw" theory.[17] In its classic formulation, this theory applies when: (1) The plaintiff's supervisor, who is not the final decisionmaker, performs an act motivated by impermissible animus; (2) The supervisor intends the act to cause an adverse employment action; and (3) The supervisor's act is a proximate cause of the adverse employment action the plaintiff suffered. *Id.*[18] If all three

---

[17] This term comes from an Aesop fable in which "a monkey induces a cat by flattery to extract roasting chestnuts from the fire" and, "[a]fter the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub*, 562 U.S. at 415 n.1. A person motivated by proscribed bias, who has decisive input into an adverse employment action, is the monkey behind the paw of the ultimate decisionmaker that does the deed. *Steele v. Mattis*, 899 F.3d 943, 951 n.4 (D.C. Cir. 2018).

[18] Although the Circuit appears not to have decided the question, the parties agree that cat's-paw liability applies to retaliation claims. *See* Proposed Jury Instructions 15. Other judges in this District have taken the same approach, and the Court assumes without deciding that a plaintiff claiming retaliation can proceed on a cat's-paw theory of liability. *See, e.g.*, *Duncan v. Johnson*, 213 F. Supp. 3d 161, 190-96 (D.D.C. 2016) (applying cat's-paw theory to retaliation claim).

elements are satisfied, "[a]nimus and responsibility for the adverse action can both be attributed to the [supervisor]" who acted with animus intending an adverse consequence. *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011). The parties agree that the person who harbors impermissible animus need not be a direct supervisor. Proposed Jury Instructions at 15; *see also Breen v. Chao*, 253 F. Supp. 3d 244, 159 (D.D.C. 2017) (entertaining cat's-paw theory where an agency's Administrator and the Director of an agency office had impermissible animus).

Agent Heller's counsel struggled to articulate the precise details of his theory of the case at trial.[19] But it is clear that he proposes to use a cat's-paw theory of liability against the EPA and EPA OIG. *See, e.g.*, 7/17/18 Tr. 7:14-23, 14:8-9, 14:8-9 (articulating cat's-paw theory of liability); 7/19/18 Tr. 136:4-13, 189:9-190:15 (same); Pl.'s Proposed Findings of Fact ¶ 175 (same).[20] The argument is that someone or some group of people at the Administrator's Office—DCOS Reeder, Administrator McCarthy, or Mr. Garbow—held retaliatory animus against her because of her EEO activity. *Id.* According to this theory, whoever at the Administrator's Office held this animus used AIGI Sullivan and DAIGI Williams as instruments of their retaliation. *Id.*

But a cat's paw theory does not permit Agent Heller to hold OIG liable for acting as an instrument of retaliation in the hands of the Administrator's Office. Under a cat's paw theory,

---

[19] *See, e.g.*, 7/17/18 Tr. 10:6-15 (opening statement) ("It may be that you will be persuaded that it was John Reeder who's pulling all the strings. Gina McCarthy was named as the defendant, as required by law. Maybe you decide that she was influencing John Reeder. Perhaps Art Elkins . . . the Inspector General, you will decide he was influencing Allan Williams or Allan Williams him. In the end, it doesn't matter . . . ."). During trial, Agent Heller offered no evidence implicating the Inspector General.

[20] As noted above, Agent Heller suggests that AIGI Sullivan and DAIGI Williams were not "purely the cat's paw" but bases this argument on allegations that they were coerced by others who held retaliatory animus—allegations that fit within the cat's paw theory and that do not establish personal animus. *See id.* ¶ 181.

responsibility for an adverse employment action is attributed to the individual who acts with animus and intends to cause someone else to take the adverse action. *Staub*, 562 U.S. at 419. Agent Heller proposes to use the cat's paw theory the other way around, so that responsibility for the instigator's animus is attributed to the person who performs the adverse action. The Court has already found that AIGI Sullivan and DAIGI Williams did not act with animus. Nor has Agent Heller shown retaliatory animus on the part of anyone else at OIG. Indeed, the undisputed evidence at trial showed that SIA Williams was universally disliked in EPA OIG and that Agent Heller's EEO complaint against him was widely supported there. Thus, Agent Heller has failed to show, through the cat's-paw theory or in any more direct way, that OIG acted with intent to retaliate.

Nor does Agent Heller's cat's-paw theory provide grounds for a claim against the Administrator's Office. The first element of a cat's paw claim requires Agent Heller to show that someone at the Administrator's Office acted out of an impermissible animus. *Morris*, 825 F.3d at 668. But the Court has already determined that any animosity DCOS Reeder felt had to do with bureaucratic in-fighting, and there is no evidence that anyone else at the Administrator's Office had a reason to take offense at Agent Heller's EEO complaint. This finding alone is enough to defeat Agent Heller's claim against the Administrator's Office.

The second element requires Agent Heller to show that the individual intended his act to cause an adverse employment action. *Id.* Agent Heller's theory appears to be that DCOS Reeder tainted the DOD Report by mentioning her EEO, that Mr. Garbow could have tainted the Report by offering Mr. Boyll an interpretation of Policy 207 that changed the Report's findings, and that Administrator McCarthy and Mr. Garbow pressured OIG to act against Agent Heller. *See* Pl.'s Proposed Findings of Fact ¶¶ 57, 67, 175. But it is not clear how DCOS Reeder could have

expected that mentioning Agent Heller's EEO activity would result in an adverse finding by DOD. And there is no evidence that Mr. Garbow offered Mr. Boyll any interpretation of Policy 207. On the other hand, Administrator McCarthy's letter suggesting that OIG consider whether it had external reporting obligations related to the DOD Report's findings could conceivably reflect an intent to cause an adverse employment action.

The third element of a cat's paw theory requires Agent Heller to show that the person who acted with impermissible animus did something that proximately caused an adverse employment action. *Staub*, 562 U.S. at 419. Even if DCOS Reeder tried to taint the DOD Report by mentioning her EEO complaint, this did not proximately cause DAIGI Williams to counsel Agent Heller. DCOS Reeder's conduct did not affect the DOD Report's findings. Even if it did, DAIGI Williams conducted his own independent review of those findings. And even if Mr. Garbow offered Mr. Boyll an interpretation of Policy 207, DAIGI Williams found that Agent Heller violated the policy based on his own consultation with OIG counsel. Finally, even if Administrator McCarthy tried to pressure OIG into disciplining Agent Heller, Agent McCarthy's efforts did not influence DAIGI Williams, who was unaware of them. And he had made his decision the day before Administrator McCarthy sent her letter. DAIGI Williams gave Agent Heller a non-disciplinary oral counseling because of his independent investigation and told her to make *Giglio* disclosures because of the advice of OIG counsel—not because of anything done by the Administrator's Office.

*     *     *

At first, Agent Heller approached Mr. Martin with the implicit approval of an OIG manager. In the end, she suffered significant consequences disproportionate to her conduct. So she went to court and tried to remedy the injustice. The picture that emerged at trial was one of a

good and well-liked agent who was mistreated, at least by SIA Williams, in an acrimonious turf-war. The picture is not appealing and does not reflect well on the EPA. But it does not show that Agent Heller is entitled to relief on a Title VII retaliation claim. To succeed on such a claim, Agent Heller would have to show that her EEO activity was the but-for cause of the oral counseling she received. And she would have to rebut the Defendants' claim that she received the counseling because of DAIGI Williams's good-faith determination that she violated Policy 207 by showing that someone acted against her with an intent to retaliate. This she has not done.

Although Agent Heller cannot prevail on her Title VII claim, she has attained some level of vindication in the evidence that Agent Heller's reliance on AIGI Sullivan's implicit approval of her plan to approach Mr. Martin exculpates her from any wrongdoing. Her concerns about *Giglio* may be relieved by Mr. Larsen's testimony that DAIGI Williams's instruction does not bind her and by the Court's determination that the oral counseling does not implicate her credibility. Hopefully, this will provide some degree of resolution for a good agent who found herself in a bad situation.

### III.  CONCLUSION

For the reasons explained above, the Court will enter judgment in favor of the Defendants on Agent Heller's Title VII retaliation claim. A separate order will issue.


Dated: October 1, 2018                          _____

                                                TREVOR N. MCFADDEN, U.S.D.J.